SCHLISKA v. ROSS.

1. EXCHANGE OF PROPERTY—FRAUD—EVIDENCE—SUFFICIENCY.
    In a suit to set aside a contract for the exchange of plaintiff's city property for a farm, on the ground of fraud, the finding of the court below that defendants misrepresented to plaintiffs the value of the farm, the nature of the soil, the drainage and fencing, that plaintiffs relied
        230—Mich.—15.

on said misrepresentations and were thereby induced to convey their property to defendants, *held*, supported by a preponderance of the evidence.[1]

2. SAME—VENDOR AND PURCHASER—VALUE OF FARM RECITED IN CONTRACT.

Where a contract for the sale of a farm recited that the consideration was $7,000 and other considerations, one dealing with the purchasers had a right to believe that the value of the farm, as fixed in the contract, was in excess of $7,000, although that, in fact, was the contract price, especially in view of the fact that he was assured by one of the defendants that it was "an awful good farm," and was worth $12,000.[2]

3. CONTRACTS—FRAUD—EQUITY—REASONABLE PROMPTITUDE NECESSARY AFTER DISCOVERING FRAUD.

A court of equity will not grant relief from a contract procured by fraud, unless the party defrauded has proceeded with reasonable promptitude after discovery of the fraud.[3]

4. SAME—LAPSE OF TIME ALONE NOT CONCLUSIVE.

Lapse of time is not always determinative of the right to relief from a contract procured by fraud.[4]

5. SAME—DEFRAUDED PARTY MAY NOT SPECULATE ON BARGAIN.

A person may not, after he knows that he has been defrauded, speculate upon the bargain made by him, and, if it prove to be disadvantageous, secure the benefit of a rescission.[5]

6. SAME—LACHES—DELAY IN RESCISSION—EQUITABLE RELIEF.

Where the delay of the defrauded party is not attended with any disadvantages to the other party by reason of changes in values, improvements made, the inability to produce evidence to rebut the claim made, or other circumstances materially affecting the conditions and relations of the parties, appropriate equitable relief will not be denied.[6]

7. SAME—EXCHANGE OF PROPERTY—DELAY IN RESCISSION.

Where defendants procured, without consideration, the assignment to them of a contract for the sale of a farm, which they assigned to plaintiffs for a valuable consideration, its foreclosure by the seller, because of plaintiffs'

[1]Cancellation of Instruments, 9 C. J. § 195; [2]Frauds, 26 C. J. § 110; [3]Cancellation of Instruments, 9 C. J. § 81; Contracts, 13 C. J. § 671; [4]Id., 9 C. J. § 81; Equity, 21 C. J. § 219; [5]Id., 9 C. J. § 82; [6]Id., 9 C. J. § 81.

default in making payments, did not deprive defendants of substantial rights and was therefore no bar to plaintiffs' rescission on the ground of fraud, although said rescission was delayed.[7]

8. SAME—RESCISSION—FRAUD—DELAY EXCUSED WHERE DEFRAUDED PARTY LULLED INTO FEELING OF SECURITY.

While ignorance of one's legal rights will not ordinarily excuse delay in proceedings to obtain rescission, this rule is somewhat relaxed where fraud is charged and there is evidence that the defrauded party has been lulled into a feeling of security and his delay in beginning proceedings has been due to the continuing promises of the person who defrauded him, and especially where there is a confidential relationship between the parties.[8]

9. SAME—FRAUD—DELAY OF DEFRAUDED PARTY—RESCINDING EXCUSED BY PROMISES OF OTHER PARTY.

Repeated promises made to plaintiffs that they were dealing with a bank and would receive such financial assistance as was necessary to permit them to carry out their contract, which were relied upon by them until such assistance was refused, when they realized that they had been defrauded, *held*, to excuse their delay in rescinding the contract.[9]

10. EXCHANGE OF PROPERTY — WHERE RECONVEYANCE IMPOSSIBLE DECREE FOR VALUE JUSTIFIED.

Where defendants had sold the property they received from plaintiffs, in an exchange of property, so that reconveyance was impossible, on plaintiffs' rescission of the contract for fraud, a decree against defendants for $3,774, the value thereof, was justified.[10]

Appeal from Wayne; Hart (Ray), J., presiding. Submitted January 16, 1925. (Docket No. 133.) Decided April 3, 1925.

Bill by William Schliska and another against Fay E. Ross and another to set aside an exchange of property on the ground of fraud. From a decree for plaintiffs, defendants appeal. Affirmed.

[7]Cancellation of Instruments, 9 C. J. § 81; [8]Id., 9 C. J. § 84; [9]Id., 9 C. J. § 84; [10]Id., 9 C. J. § 211.

*Edgar G. Gordon,* and *Wallace Visscher,* for plaintiffs.

*Charles L. Mann,* for defendants.

SHARPE, J.    In February, 1921, plaintiffs were the owners in fee of two houses on one lot on Chestnut street in the city of Detroit.    There was a mortgage on it, on which there was due approximately $2,272. The property was then rented.    Plaintiffs rented and lived on a 10-acre farm outside the city limits.    Minnie Schnurstein, a widow living in Detroit, owned a farm of 125 acres three miles from the village of Milan. The defendant Ross was at that time cashier of the Milan State Savings Bank.    He also dealt in real estate.    The defendant Chase was in his employ, assisting in real estate deals.    Mrs. Schnurstein was desirous of disposing of her farm.    A married son, George, had theretofore worked it.    On January 19, 1921, George, at Chase's suggestion, procured from his mother a contract for the purchase of the farm. The consideration expressed was $7,000 "and other considerations."    The terms of payment were stated to be:

"Other considerations upon the delivery of this contract and the remaining seven thousand dollars eight years from date with $200 due September 1, 1921, and $200, every six months thereafter."

—with the further provision that any additional amounts would be accepted at any time.    Possession was to be delivered on March 1, 1921.    On the day following its execution, George and his wife, in consideration of "one dollar and other valuable consideration," assigned their interest in this contract by a written instrument separate therefrom to the defendant Ross.    There was no consideration for this assignment.    These instruments were drawn up by Ross.    Chase testified that the contract and assign-

ment were made, instead of a contract with Ross, in order to relieve Ross from any personal liability to Mrs. Schnurstein. Ross at that time, however, signed a writing agreeing to pay Mrs. Schnurstein the "$200 payment due September 1, 1921, provided it is not paid by other parties." On January 27th, the following advertisement appeared in the Detroit News:

"Farm for sale or exchange for city property. Deal with owner and save commission—Mr. Chase, 7222 West Jefferson, Cedar 97."

The address given was not that of Mr. Chase, but of one John Andison, with whom Chase had theretofore had real estate dealings. On January 28th, plaintiffs wrote Chase about the farm at the address given. On February 4th, Chase and Andison went to see plaintiffs at their farm home. They secured the description of plaintiffs' Chestnut street property and went and looked it over. Plaintiffs at that time placed a value on it of $8,000, subject to the mortgage. On February 6th—Sunday—Chase called for plaintiffs and took them to the Schnurstein farm. The ground was then partially frozen, and parts of it were flooded. They returned to Milan, where Chase treated the plaintiffs to dinner at a hotel. He called up Ross, and went to the bank and met him. After a private conference between Chase and Ross, an agreement was drawn up by the latter, dated February 5th, and signed by him and the plaintiffs. In it he agreed to trade the Schnurstein farm "with $7,000 against it" for plaintiffs' Chestnut street property with $2,000 mortgage against it. He further agreed to furnish plaintiffs with certain stock and personal property, and to loan them "$200 for one year on above security." He also agreed to furnish six cows between May 1st and May 15th "on property holding note for one year for cost of stock." The concluding paragraph reads:

"Schliska agrees to give deed Monday, February 7, 1921, to Chase and Chase will deliver receipt for land contract on farm."

On the following day, Chase went to plaintiffs' home and took them to Royal Oak, where they executed a warranty deed of their city property to Ross and delivered it to Chase. The consideration was stated as "one dollar and other valuable considerations." It was made subject to a mortgage of $2,000. Chase at this time gave plaintiffs a duplicate of the agreement executed the day before and what is spoken of as a "receipt for the contract." It does not appear in the record. They then went to the home of the mortgagee to ascertain the amount due on the mortgage, but were unable to see him.

Plaintiffs took possession of the farm in the latter part of March. Soon after, William Schliska asked defendant Ross about the contract and was informed that there was more than $2,000 owing on the mortgage on the city property, and that he could not have the contract. There was difficulty about the furnishing of the stock under the agreement. The cows were not delivered until about September 1st. The payment on the Schnurstein contract, which fell due on September 1st, was paid by Ross. A settlement was had about that date, plaintiffs executing a chattel mortgage on their personal property to Ross for $738, payable $35 per month. This amount included the excess due on the mortgage on the city property, the payment to Mrs. Schnurstein, and the price of six cows. The land contract was then assigned to and delivered to plaintiffs.

By borrowing money from relatives and the proceeds from the cows, plaintiffs were able to make part payment of the amount due on the contract in March and partial payment on the chattel mortgage. He got a job in Detroit, and left his wife and children to run the farm. In August, 1922, Ross threatened

foreclosure of the chattel mortgage. Mrs. Schnurstein was also threatening foreclosure of the land contract. Ross was appealed to for help, but declined to grant it. Chase was asked to sell the farm or trade it for one of less value.

Proceedings before a circuit court commissioner to recover possession were taken, and a judgment entered on November 27th, containing a finding that $7,004 was due thereon. No appeal was taken. On December 11th, plaintiffs held an auction sale of their personal property, the proceeds amounting to $747.90. The amount due on the Ross chattel mortgage was paid out of this, and the balance of $131 paid to plaintiffs.

On December 28, 1922, plaintiffs served notice of rescission of their contract with Ross, and with it a written surrender of their interest in the farm under the land contract. The bill of complaint herein was filed on the following day. The allegations in it recite many of the facts heretofore set forth. It avers misrepresentation on the part of both Ross and Chase as to the character of the soil and its state of fertility, and also as to its value. It alleges that plaintiffs were induced to execute the deed of their city property by reason thereof and by a parol agreement then entered into by defendants to finance plaintiffs and aid them in their farming operations, which had not been kept. Many different kinds of relief were prayed for, among them being the cancellation of their deed to the city property.

The trial court found that such fraud had been practiced upon the plaintiffs as justified rescission. It appearing that Ross had disposed of the city property, he found the amount of which plaintiffs had been defrauded to be $3,774, for which sum he gave a personal decree against both defendants. They appeal.

The trial court found that the representations claimed by plaintiffs as to the value of the property,

the nature of the soil, the drainage and the fencing were made by the defendants, that they were untrue, and that they were relied on by plaintiffs, and that by reason thereof they were induced to convey their city property to Ross.    His finding in this respect is clearly supported by a preponderance of the evidence. The manner in which the contract was secured from Mrs. Schnurstein indicates the purpose of the defendants.   They sought thereby to make it appear that she was receiving on the sale of her farm a sum in excess of the contract price, whereas the price at which she was willing to sell it was that fixed in the contract.    In the agreement prepared by Ross, plaintiffs agreed to take the farm "with $7,000 against it."    Plaintiffs, when making the deal, had a right to believe, and did believe, that the value of the farm as fixed by her on its sale was a sum in excess of the contract price.

"Fraud may be consummated by suppression of facts and of the truth, as well as by open false assertions." *Fred Macey Co.* v. *Macey,* 143 Mich. 138, 153 (5 L. R. A. [N. S.] 1036).

They were assured by the defendant Chase that it was "an awful good farm," and was worth $12,000. When they expressed a doubt as to their ability to handle so large a proposition, Chase said to them:

"Now, remember you are dealing with the bank; you are not dealing with no real estate man, and whenever you get in need of anything just stick to us and we will see you through."

Mrs. Schliska testified that when this statement was made she—

"thought it was a good offer then that they would help us.    We told him then that we would take that offer."

The plaintiffs struggled along and made every possible effort to meet the payments on the contract and chattel mortgage when they became due.    When it

became apparent that they could not do so, Chase was appealed to.    Mrs. Schliska testified:

"I asked Mr. Chase if there was no way he could sell the farm or trade for either a small house or a small farm so I could get a home out of it.    He simply looked up and said, 'It is impossible.'    That was some time in May, 1922.    I again asked him after they foreclosed.    I begged Mr. Chase if there was no way he could get me a place or get me the money so I could get another chance to pick up a little.    He says to me, 'That would be throwing away good money with bad money.'"

She also wrote Mr. Ross appealing for aid, but he declined to help them.    She also testified that they had "on different times" sought the aid of defendants in their distress, but without avail.    They were unable to raise sufficient crops on the farm to feed the stock they had thereon.

It is strongly urged by defendants' counsel that plaintiffs were guilty of such laches as precludes their right to rescind and bars their recovery in this suit. In most cases the time within which an action must be begun is fixed by statute.    When, however, the aid of a court of equity is sought to relieve a person from a contract procured by fraud, it will not grant such relief unless the party defrauded has proceeded with reasonable promptitude after discovery of the fraud.    *Bowen* v. *Stocklin*, 215 Mich. 341.    Lapse of time is not always determinative of such right. *Fred Macey Co.* v. *Macey, supra; Compo* v. *Jackson Iron Co.*, 49 Mich. 39.    The refusal to grant relief in such cases is based on many considerations.    A person may not, after he knows that he has been defrauded, speculate upon the bargain made by him, and, if it prove to be disadvantageous, secure the benefit of a rescission.    *Draft* v. *Hesselsweet*, 194 Mich. 604.    The holding in these cases rests largely upon the effect of such delay upon the other party to

the contract.    He has a right to assume, after the lapse of such time as must necessarily have acquainted the party with whom he has entered into contractual relations with all the facts concerning the subject-matter of the contract, that he is satisfied with the bargain and intends to stand by it.    He may therefore safely proceed to handle that which he has acquired under the contract without danger of loss in case of rescission.    When, however, the delay is not attended with any disadvantage to the defendant, by reason of changes in values, or improvements made, or the inability to produce evidence to rebut the claim made, or other circumstances materially affecting the conditions and relations of the parties, appropriate relief will not be denied in a court of equity for this reason.    10 R. C. L. p. 401, § 147.    The subject of "Laches" is considered at length in this volume, beginning at page 395.    On page 396, § 143, it is said:

"While statements are to be found in some of the cases intimating that unreasonable delay, and mere lapse of time, independently of any statute of limitations, constitute a defense in a court of equity, the generally accepted doctrine appears to be that laches is not like limitation a mere matter of time, but is principally a question of the inequity of permitting a claim to be enforced, this inequity being founded on some change in the condition or relations of the property or the parties.    Since lapse of time has a tendency to obscure evidence, and often makes it impossible to discover the truth, it is, of course, one of the elements to be considered by the court in applying laches to stale claims, but it is only one, and while important, it is not ordinarily the controlling or most important one.    Hence, it has been said, laches in legal significance, is not mere delay, but delay that works a disadvantage to another.    So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed that he

cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as an estoppel against the assertion of the right. When a court sees negligence on one side and injury therefrom on the other it is a ground for denial of relief."

The cases in the footnote will be found instructive, and well support the language in the text. The reason stated why relief will not be denied when the delay has caused no disadvantage to the other contracting party is peculiarly applicable to the facts here presented. Had Ross secured the contract from Mrs. Schnurstein by a *bona fide* purchase of the farm from her, there would be force in the contention that its foreclosure by her deprived him of substantial rights thereunder. But he did not do so. He had no interest whatever in the contract. It was made for the express purpose of inducing a purchaser of the land to believe that it did not represent the price at which she was selling the farm. The $7,000 stated therein was undoubtedly all or more than the farm was fairly worth. As the deal was consummated, the defendant Ross got title to plaintiffs' city property without paying a dollar therefor except the comparatively small value of the personalty he turned over to plaintiffs. Had plaintiffs had knowledge of their legal rights, they would doubtless have called the defendants to account for the fraud practiced upon them before this suit was begun. They were ignorant foreigners, unfamiliar with our laws, and continued to rely on the promises of Chase that they were dealing with a bank and would be given such assistance as was necessary to assist them in meeting their obligations.

While ignorance of one's legal rights will not ordinarily excuse delay in proceedings to obtain rescission, this rule is somewhat relaxed where fraud is charged and there is evidence that the defrauded

party has been lulled into a feeling of security and his delay in beginning proceedings has been due to the continuing promises of the person who defrauded him. This is particularly true where there is anything in the nature of a confidential relationship between the parties. 21 C. J. p. 247 *et seq.*

On the record as here made, we are of the opinion that the plaintiffs were impressed by the fact many times stated to them that they were dealing with a bank and would receive such financial assistance as was necessary to permit them to carry out their contract. It was only after such assistance was refused that they realized that the fraud practiced upon them meant the entire loss of all of the savings they had accumulated up to that time, and which were represented by their interest in the city property.

"The delay in moving may always be explained, and, if satisfactorily accounted for, relief will be granted, notwithstanding the lapse of time." *Bayley* v. *Friedberg*, 226 Mich. 125, 129.

The decree is so manifestly just that we are unwilling to disturb it for this reason. Mr. Ross had not invested a dollar in the farm at the time the deal was made. He testified that Chase then told him plaintiffs' Detroit property "was worth in the neighborhood of $5,000 or $5,500—somewhere around that." Had he kept this property, the decree would have ordered its reconveyance to plaintiffs. The record does not disclose the consideration he received for its transfer. We are satisfied that no injustice was done to him in the value placed on it by the trial court.

The decree is affirmed, with costs to appellees.

McDONALD, C. J., and CLARK, BIRD, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.