GEO. H. GLASS, CHAS. L. GLASS, and GLASS ZINC MINING COMPANY, Respondents, v. L. D. TEMPLETON, G. D. LADD, E. M. GERKE, J. T. GRAHAM, O. C. McCOLLUM, J. F. ARVIN, R. B. SUMMERS, WM. MARSEILLES and TEXMO MINING COMPANY (a corporation), Appellants.

Springfield Court of Appeals, November 27, 1914.

1. **FRAUD: Misrepresentations: When Not Defense.** One who investigates for himself and has the means of ascertaining the facts cannot be heard to say that he relied on the misrepresentations of another.

2. **MINES AND MINING: Misrepresentations as to Royalty: Independent Investigation.** The purchasers of an interest in a mining lease have a right to rescind their contract because of misrepresentations as to the amount of royalty, although they had prior to the purchase made independent investigation which revealed only the amount of royalty represented as payable to the owner and not the additional royalty payable to the assignors.

3. ———: ———: **Equal Means of Investigation.** Purchasers of an interest in a mining license relied upon representations of sellers as to the amount of the royalty. The facts connected with the payment of such royalty were known to the vendors, but it was difficult for others to learn thereof. The purchasers did not have the equal means of investigation with the vendors which would defeat their right to rescind.

4. **RESCISSION: Reasonable Time for: How Determined.** A party to a contract must exercise the right of rescission within a reasonable time after discovering the facts warranting such action. What is a reasonable time depends largely upon the facts of each particular case.

Glass v. Templeton.

5. **MINES AND MINING: Licenses: Rescission: Laches.** Purchasers of an interest in a mining lease are not barred of their right to rescind same on account of misrepresentations as to the amount of royalty, because they continued to operate the mine jointly with defendants for six months after first learning of the additional royalty, during which time the vendors were promising and attempting to reduce the royalty to the amount represented.

6. **MINES AND MINING: License: Fraud as a Ground for Rescission: Bankruptcy.** The fact that a corporation, formed by the owners of a mining license and the purchasers of a part interest thereof, went into bankruptcy, does not defeat the right of the purchasers to rescind the contract of purchase as against the vendors because of certain misrepresentations as to the royalty.

### On Motion for Rehearing.

7. **JURY: Waiving Right to Trial by.** After trial by jury is waived and the issues submitted to the court, the right to a trial by jury cannot be invoked by an objection to the introduction of evidence on the ground that the bill does not state facts authorizing the court to take equitable jurisdiction, so that a trial of the case would deprive defendant of a jury trial.

Appeal from Jasper Circuit Court, Division Number Two.—*Hon. D. E. Blair,* Judge.

AFFIRMED.

*George V. Farris,* and *H. W. Currey* for appellants.

(1) A party seeking to rescind a contract for fraud must act promptly on discovery of the fraud; and if after such discovery he takes any action relating to the enforcement of said contract, his right to rescind is thereby denied. Long v. Vending Machine Co., 158 Mo. App. 662; Stephenson v. Allison, 26 So. 290; Whitcomb v. Hardy, 76 N. W. 29; Bedier v. Reaume, 55 N. W. 366; Thomas v. McCune, 53 Pac. 161. (2) In actions of fraud, where the allegations of fraud are supported by the testimony of a single witness (as in

this case) and his testimony is positively and precisely denied by the defendant on oath, or witnesses in his behalf, the plaintiff fails unless corroborated by letters or other documents in the case. Wenstrom, etc., Co. v. Purnell, 23 Atl. 135; Longenecker v. Zion, etc., Church, 50 Atl. 244; Allison v. Ward, 29 N. W. 528. (3) For the plaintiffs to be entitled to a rescission on the grounds of fraudulent representation, they must be clearly and satisfactorily established; must have been material; and have been relied on, constituting the very ground on which the transaction took place. King v. Lamborn, 186 Fed. 21; Sullivan v. Pierce, 125 Fed. 105. (4) If the plaintiff vendee makes an independent examination, he cannot thereafter claim that he relied on the defendant's (vendor) representations, and no rescission will be granted on the ground if such representations were false. Farnsworth v. Duffner, 142 U. S. 43; Anderson v. McPike, 86 Mo. 293; Warren v. Ritchie, 128 Mo. 311; Garrison v. Technie, etc., Works, 45 Atl. 614. (5) Where the complaining party has at hand the means of knowing the real facts and neglects to avail himself of them, false representations made in the course of dealing will not afford sufficient ground for rescission. Lewis v. Land Co., 124 Mo. 673; Hamilton v. McLean, 169 Mo. 73; New Orleans, etc., Co. v. Musgrove, 7 So. 747; Crocker v. Manley, 45 N. E. 577.

*Spencer, Grayston & Spencer* for respondents.

(1) There was nothing in the conduct of the plaintiffs between the time when they discovered the fraud and the time when they notified defendants of their rescission which evinced a purpose to retain the property and their right to rescind the contract should not be defeated. 6 Cyc. 300. (2) Mere delay in asserting rescission does not defeat the right to cancellation of a contract. Delay may be explained or ex-

cused by the circumstances, and the court will consider such circumstances and also whether or not defendants have been injured by such delay. 6 Cyc. 300-306.

· STURGIS, J.—The defendants, claiming to own a mining license on eight mining lots in Jasper county, Missouri, made a written contract with plaintiffs, who owned a mining plant and machinery located on other land, by which the plaintiffs were to remove this plant and machinery and install and reconstruct it on defendants' mining lots and thereby put their property in a condition to produce and clean mineral ores. Defendants represented and the contract states that they owned and held this license at twenty per cent royalty on the ores mined and produced. The contract provides that as soon as the mining plant and machinery is moved and reconstructed on defendants' lease, the defendants in payment therefor shall convey and assign to plaintiffs an undivided one-fourth interest in their lease. The plaintiffs moved and reconstructed the mining plant on the mining lots covered by defendants' license.

This is a suit to rescind said contract, recover the mill and mining machinery moved onto said lots and to recover the amount expended by plaintiffs in such removal and reconstruction on the ground of fraud and misrepresentation inducing the making and carrying out of such contract. The fraud and misrepresentation claimed relates to the rate of royalty to be paid on the mineral ores mined on said land under defendants' license.

Sometime after the removal by plaintiffs of their mining plant onto these mining lots in question, the plaintiffs and defendants formed a corporation called the Texmo Mining Company, defendant herein, with themselves as stockholders and the mining license with the mining plant thereon as the capital stock, such

property being conveyed to the corporation and the stock issued and held by plaintiffs and defendants in the same proportion as their agreed interest in the consolidated property—one-fourth of the stock belonging to plaintiffs and three-fourths to the defendants. The organization of the Texmo Mining Company was for mere convenience in carrying on the mining operations and worked no actual change as to the interest of the parties between themselves.

The evidence clearly shows that as soon as mining operations were actually commenced and ore produced, that the owner of the first lease on the land, designated herein as landlord, under whom defendants and plaintiffs held these lots as licensees under the mining rules and regulations prescribed by such landlord, demanded and retained thirty per cent royalty on all ores mined on the land. This the landlord continued to do so long as mining was done and in fact until the Texmo Mining Company went into bankruptcy, ceased to mine these lots and the mining license was forfeited.

If it be true that plaintiffs were deceived and induced to make and carry out the contract as to moving the mining plant to these lots by defendants' representations that they held the right to mine same on a twenty per cent royalty and, in fact, could only mine thereon by paying a thirty per cent royalty, no one will question the materiality of the misrepresentation or indeed as to this being a material cause of the failure and bankruptcy of the company. Defendants' answer is a general denial, though several special defenses are urged here as being sustained by the evidence.

The evidence is quite conflicting in many respects and, as the case is in equity, we should and have reviewed all the evidence and have reached the same conclusion as the learned chancellor who heard the evidence face to face with the witnesses. It appears that

several parties known as the "Burklin crowd" were the original licensees of these lots or the ones of them containing the mineral deposits and on which the mining was done, and had agreed to sell their rights to defendants but the sale had not been and never was fully consummated. As we understand it, the Burklin crowd had offered and gave an option to sell the license to defendants for $7000 in cash, but this option expired and a new deal was proposed at $8000 on time and ten per cent of all ores mined to be applied in payment of this sum. This gave rise to the extra ten per cent royalty, as the license itself provides for twenty per cent. After plaintiffs' mill was moved on the land and the controversy came up as to paying this extra ten per cent royalty, which was being retained out of all ores produced, the defendants kept promising and trying to arrange to either pay the Burklin crowd the whole amount in cash or have the Burklin crowd take defendants individually with security on their separate interests in the mining property or stock of the corporation; but no such deal was consummated. One of the Burklin crowd, in testifying of this arrangement for selling or transferring their license to defendants, said in substance: We gave them (defendants) a license or contract on a royalty of thirty per cent, with an option to buy it down to a twenty per cent. royalty basis, the price being $8000. There were several papers signed at different times and more than one option. The option and contract were renewed at different times. We were to pay twenty per cent. The contract was made requiring them to pay thirty per cent until the extra ten per cent had discharged the $8000. Another witness, speaking of defendants' dealings with the Burklin crowd, said they had compromises and different propositions for six months, every week or two, and never agreed upon anything; they were trying to settle the extra ten per cent royalty they were paying on the ground. It ap-

pears that at the time the mine shut down, before the
bankruptcy proceedings, there had been paid to the
Burklin crowd about $1600 by means of this extra ten
per cent royalty over and above the twenty per cent
going to the landlord.

Appellants insist that, notwithstanding the writ-
ten contract recites that the mining lots in question
are held by defendants on a twenty per cent royalty,
the weight of the evidence shows that plaintiffs knew
of the contract for purchase of the license by defend-
ants from the Burklin crowd and the additional bur-
dens imposed thereby. As a corollary to this, it is
argued that plaintiffs did not rely upon the representa-
tions of the defendants as to the rate of royalty to be
paid but made an independent investigation for them-
selves. It appears that at the time of making the con-
tract in issue certain of the plaintiffs and defendants
did go to the landlord to ascertain the rate of royalty to
be paid on these lots. The landlord confirmed the
statement as to the rate being twenty per cent—and
so it was, so far as such landlord was concerned. The
landlord, however, did not know or, at least, did not
disclose the status of the deal between the defendants
and the Burklin crowd as first owners of this mining
license. If the defendants had already paid the Burk-
lin crowd or should do so, then the royalty would be
twenty per cent. The only information thus obtained
was in confirmation of defendants' representations
that the lots were burdened with only twenty per cent
royalty and did not disclose and was not calculated to
disclose the fact that the Burklin crowd still held such
ownership or control of the license that they could, and
subsequently did, exact and enforce the payment of
an additional ten per cent royalty as part payment of
the purchase price due the Burklin crowd. Plaintiffs
testify that they knew nothing of this additional bur-
den until long after the mill was moved to the lots in
question and the fact was first disclosed to them when

the first car of ore was sold and the extra royalty withheld. We agree with the trial court in so finding.

Clearly the rule of law that one who investigates for himself and has the means of ascertaining the facts, as for instance the character or value of land, cannot be heard to say that he relied on the representations of another, Anderson v. McPike, 86 Mo. 293, 300, and like cases, have no application here. Defendants knew that the investigation made by plaintiffs did not yield information as to the matter now complained of.

It is apparent also that we cannot apply to the facts of this case the rule of law invoked, that where the means of information are equally accessible to both vendor and vendee there can be no fraud, for the reason that defendants had full and positive information as to this matter peculiarly within their own knowledge. Nor did the plaintiffs have at hand the means of knowing the real facts and wilfully shut their eyes thereto. It was difficult to find out even in the trial of this case the real basis of the authority by which ten per cent additional royalty was withheld for the Burklin crowd. See what is said in Adams v. Barber, 157 Mo. App. 370, 395, 139 S. W. 489, and Judd v. Walker, 215 Mo. 312, 330, 337, 114 S. W. 979, on this point.

Appellants also invoke, though not pleaded, the doctrine of laches and claim that plaintiffs have lost their right to rescind by delay in asserting such right until long after the facts were discovered. That a plaintiff must exercise the right of rescission within a reasonable time after discovering the facts warranting such action is unquestioned. [Long v. Vending Mach. Co., 158 Mo. App. 662, 139 S. W. 819; Althoff v. Transit Co., 204 Mo. 166, 102 S. W. 642.] The claim is that plaintiffs jointly with defendants, as partners or a corporation, continued to mine and operate the mill five or six months after the first extra royalty was deducted—and this is true. What is a reasonable time for exercising the right of rescission depends largely

upon the facts of each particular case. That the delay, as in this case, works no injury to the other party is an important factor. [6 Cyc. 301.] Time to investigate and ascertain the full facts and one's rights in the premises excuses delay. When the delay is induced by the acts of the other party or in an effort to adjust or remove the cause of complaint, that is certainly an excuse. Here we find that after the first extra royalty was deducted, defendants were denying the right of the Burklin crowd to do so. They were promising and endeavoring to adjust the matter so as to relieve plaintiffs' interest in the property free of this claim until the mining plant was finally shut down. The trial court was right in overruling this contention.

Appellants also assert an estoppel against plaintiffs because, while one of plaintiffs was acting as an officer of the Texmo Mining Company, certain stock of that corporation was transferred to an outside party on the books by his official attestation. It is not claimed that he had anything to do with the actual sale of the stock. We can hardly see why he should refuse his official sanction to the transfer on the books. There is nothing in the pleadings raising any such defense and little is shown as to the bona fides or innocence of this stockholder. The fact was brought out in the evidence incidentally and not as an issue. We should not make reversible error of this point.

Nor can we reverse this case because the Texmo Mining Company ostensibly owning all the property, has been adjudged a bankrupt pending this suit and the property sold to pay its debts. That proceeding had for its object the protection of creditors and their rights doubtless are superior to plaintiffs' right to take back the property on a rescission. Such creditors are not parties to this suit and appellants say the bankruptcy court has paid no attention to this suit in protecting their rights. It was not intended that it should. This suit has for its sole object the adjudication of

plaintiffs' rights with respect to defendants. Plaintiffs are entitled to a judgment against defendants for a rescission of the contract and for the expense of moving and re-erecting the mining plant because induced by defendants' fraud and misrepresentations. If the property itself cannot be returned because of the superior rights of creditors asserted in the bankruptcy court, that is plaintiffs' misfortune. Possibly there will be a surplus available for this purpose. The bankruptcy proceedings could in no way affect the personal judgment against defendants for the expense of moving and reconstructing the mill.

We have noted, but need not discuss, other points mentioned by defendants. The judgment will be affirmed.

*Robertson, P. J.*, not sitting. *Farrington, J.*, concurs.


## ON MOTION FOR REHEARING.

STURGIS, J.—Defendants' motion for rehearing devotes twelve typewritten pages to a discussion of defendants' right to a trial by jury and a criticism of this court for not discussing that question in its opinion. The opinion is quite lengthy as it is. We did not deem it necessary to discuss this point for these reasons: The judgment recites that both parties appeared by their attorneys, ''and both parties announce ready for trial; *a jury being waived,* all and singular the matters in issue are submitted *to the court,*'' etc. The bill of exceptions recites that the trial being commenced, the plaintiffs to sustain the issues of their part introduced the following evidence: then follows an agreement that the contract set out in the petition is correct and may be considered in evidence without producing the original. Thereupon, Chas. L. Glass is produced and sworn as a witness for plaintiffs: ''Mr. Currey: The defendants object to the introduction of

any evidence in this case for the reason the petition fails to state facts sufficient to constitute any cause of action; and for the specific reason that the petition on its face shows that there is no equity in the bill . . . that the bill does not state facts sufficient to warrant the court in taking equitable jurisdiction for the purpose of giving any remedy, . . . and that therefore *a trial of this case* deprives the defendants of a trial by a jury of the question of the amount, if any, of their damages, for any breach of the contract set out in plaintiff's petition.''

In this way and at this time is the only mention of a trial by jury. We are not cited to any case holding that the right to a trial by jury, waived before the trial commences, can be invoked during the trial by way of argument in challenging the sufficiency of the petition by objection to the introduction of evidence thereunder. We do not concede, however, that a trial by jury can be demanded in a suit where the relief sought and granted is the rescission of a contract on the ground of its being procured by fraud and the divesting the title to property procured thereunder out of defendants and vesting same in plaintiffs.

The other matters complained of in the motion are considered in the opinion and a re-examination of the same has failed to convince us of error.

The motion for rehearing is overruled.

*Farrington, J.,* concurs. *Robertson, P. J.,* not sitting.