BAYLIES v. VANDEN BOOM, ET AL.
(Nos. 1545, 1546; June 18, 1929, 278 Pac. 551)

In case No. 1545 there was a brief for appellants by *G. C. Weatherby* of Kansas City, Mo., and *Dillon, Ellery* and *Spencer* of Cheyenne, and oral argument by *John Dillon.*

414

For the respondent in case No. 1545, there was a brief filed by *Rosenberger, McVey & Freet* of Kansas City, Mo., and *P. W. Spaulding,* of Evanston, Wyoming, and oral argument by *E. H. McVey.*

In case No. 1546, for cross-appellants, there was a brief filed by *Rosenberger, McVey & Freet,* of Kansas City, and oral argument by *E. H. McVey.* No brief was filed or oral argument made in Case No. 1546 on behalf of respondents.

418

RINER, Justice.

Francis A. Baylies, hereinafter generally mentioned as the "plaintiff," brought his action in the District Court of Uinta County, against Henry J. Vanden Boom, J. Edwin Tillotson, Bert L. Cook and Walton Brothers, a co-partnership, for a rescission of a contract of exchange of certain real and personal properties and for other relief. A review of the decree rendered by the trial court in the action is sought by direct appeal on behalf of all the parties above mentioned except Walton Brothers, who have acquiesced in the disposition of the case as made below. The appeal docketed in this court as No. 1545 is prosecuted by Vanden Boom, Tillotson and Cook, subsequently generally to be designated as the "defendants" or by their respective names, while Baylies brings up case No. 1546 as a cross-appeal. Inasmuch as by stipulation both appeals are here upon a single—though somewhat voluminous—record, and there is but one set of briefs, it will be proper to dispose of them by one opinion.

The action was tried to the court, and, so far as material here, upon an amended petition, an answer and a reply.

Plaintiff's amended pleading stating his claim for relief is in outline this: That the defendants are residents of Kansas City, Missouri, and Walton Brothers is a co-partnership whose four members are residents of Wyoming; that plaintiff on May 17, 1926, then a resident of Wyoming, was the owner of a ranch in Uinta County, consisting of certain described real and personal property, valued at not less than $125,000, exclusive of incumbrances thereon; that on said date he entered into a contract with the defendant, Vanden Boom, whereby he agreed to exchange his said ranch for the Drakehurst Hotel property in Kansas City, Missouri, title to which was held by Vanden Boom for the benefit of himself and the defendant Cook—a copy of said contract being attached to and made a part of defendant's pleading; that this contract was carried out and the necessary conveyances executed by the parties to transfer the respective properties in accordance therewith; that plaintiff was induced to and did enter into the agreement by reason of certain false and fraudulent representations made to him by the defendants, upon which he relied in making said exchange. The alleged representations and the facts claimed to show their untruth are then set forth in detail. The amended petition also alleges that after the exchange of properties in May, 1926, plaintiff did not have nor did he acquire, knowledge of the falsity of the aforesaid representations until shortly prior to the institution of this suit; that defendants Cook and Tillotson were agents of the defendant Vanden Boom and conspired with him to procure the exchange contract from plaintiff; that the defendants Vanden Boom and Tillotson have leased the ranch property to Walton Brothers, for operation on a share basis; that plaintiff prior to filing this suit offered to return to the defendants the aforesaid Drakehurst Hotel property, but that the tender thereof was refused; that he surrendered the possession of his ranch to said defendants and took possession of the Drakehurst Hotel; that he has sustained a loss of $10,962.52 by reason of the premises, by

money expended in excess of money received, as shown by a detailed statement of the receipts and expenditures set forth in his pleading. It is further alleged that defendants have sold part of the personal property on the ranch and threaten to sell the remainder unless restrained, and that a receiver is necessary to protect and preserve the property. The relief asked is in general a rescission of the exchange contract, the cancellation of the plaintiff's deeds and conveyances to the defendants for the ranch property, and also the Walton Brothers' lease, for an accounting between the parties and judgment for the money loss claimed, as above recited.

Summarized, the defendants' answer admits the execution of the exchange contract, that conveyances to and possession of the several properties involved were delivered to the respective parties, as required by the contract, and denies all other allegations of the amended petition. Further answering, the telegraphic proposal of exchange made by the defendant Cook and its acceptance by telegram through plaintiff's agent, The Hatten Realty Company, are pleaded, and it is alleged that on or about May 15, 1926, the defendants Cook and Tillotson inspected the ranch property, and on May 17, following made the exchange contract with plaintiff, and that at the same time the latter, with Cook, who was acting for Vanden Boom, executed a certain written memorandum, which is set out verbatim; that this memorandum was made to avoid future disputes as to what prior representations were made by the defendants to induce the property exchange, and that plaintiff agreed thereby that the representations set out in said memorandum were the only representations the defendants made for that purpose, and consequently plaintiff is estopped to claim other representations than those thus enumerated; that the representations set forth in said memorandum were wholly true.

The answer also charges that on April 26, 1926, plaintiff personally inspected the hotel and learned or had an

opportunity to learn, all the facts about the hotel property, and that he relied upon this knowledge and not upon any representations made by the defendants; that immediately following the exchange of properties, plaintiff moved into the hotel at Kansas City and continued to live there until December 30, 1926; that he thus became in a short time fully cognizant of all the conditions of the property and on or about July 15, 1926, bought the interest of the Drake-hurst Hotel Company under its lease of the said hotel property and took over the management of the hotel and continued to operate it until he left in December following; that with knowledge of the facts, he permitted defendant Vanden Boom to expend large sums of money in permanently improving the ranch property, all being plead to operate against plaintiff by reason of laches, estoppel and ratification; that on account of plaintiff's failure to pay installments due under the trust deed upon the hotel property, a foreclosure thereof resulted; that the ditches on the ranch property required to be cleaned out, and to avoid forfeiture of water rights, defendants were compelled to expend $7,500 for piping, cleaning ditches and other work, all of which has been completed and constitutes a permanent improvement on said lands; and that on May 22, 1926, the defendants Tillotson and Vanden Boom leased a large part of the land and personal property of the ranch to the Walton Brothers, the terms thereof being set out in detail, and they have expended the moneys aforesaid toward the improvement of the said ranch land thus in their possession. The prayer of the answer is for the dismissal of the action, and general equitable relief.

Briefly, plaintiff's reply incorporates a general denial of all the allegations of the answer not therein expressly admitted or denied, and admits his signing the written memorandum pleaded in the answer, but alleges that such memorandum covered only oral representations made by the defendant Cook in the absence of the defendant Vanden Boom on April 30, 1926, and did not affect or refer to any

other representations made to plaintiff, as set forth in his amended petition. It is denied that plaintiff inspected the hotel prior to the exchange contract, it being alleged in that respect that on April 26, 1926, he stopped at Kansas City, Missouri, between trains and was taken to the hotel building by an associate of the defendant Cook, who knew nothing about the structure and plaintiff saw only the outside and lobby of it and had no opportunity to inspect the building or its furnishings, spending only about half an hour there and that he at all times relied upon the defendants' representations, as alleged in his amended petition. The reply also avers that until July 26, 1926, the lessee, the Drakehurst Hotel Company, was in complete possession of the hotel, and concealed the facts of the business from plaintiff; that after plaintiff occupied the hotel premises, he was induced to continue by reason of the false and misleading representations of the defendant Cook concerning the hotel business; that plaintiff took over the management and lease of the hotel because no rentals were paid, and in connection therewith plaintiff purchased the hotel furniture from the lessee, believing its value to be as previously represented by the defendants; that the defendant Cook represented that the lessee was not competently managing the hotel property; that plaintiff was unable to learn the true facts until in November, 1926, and thereupon employed counsel and acted as soon as possible. The reply further denies that the work done on the irrigation ditches was an improvement in excess of $200, and that the work thus done was in large measure unnecessary and was carelessly and negligently performed; and that defendants, since their refusal of plaintiff's tender, have regained ownership and possession of the hotel, through connivance with the mortgagee, without further expense on their part.

Upon the trial the issues in litigation were very fully presented to the trial court by oral testimony, depositions and other evidence. Thereafter and on November 17, 1928, the court made and filed a comprehensive review of the case

in the form of findings of fact and conclusions of law. A decree in accord with these findings and conclusions was also, at the same time, filed. The decree found the equities in favor of the plaintiff, cancelled the several instruments of conveyance executed by him to the defendants, annulled the leases given by them to the Walton Brothers, revested plaintiff with the possession of all the real estate and unsold personal property surrendered by him under the exchange contract and gave a judgment against the defendants upon an accounting statement recited in the aforesaid findings of facts and conclusions of law for the sum of $4680.12, with interest at seven per cent from December 28, 1926, with costs. The defendants were allowed an exception to all of the decree, and the plaintiff to that part thereof which fixed the amount of the money judgment.

We shall not review in detail the evidence as to the alleged misrepresentations charged against the defendants. To do so would unreasonably extend the limits of this opinion. We deem it sufficient to say that a careful and painstaking examination of all the evidence in the record in the light of the legal principles applicable as we understand them, convinces us that the trial court was fully justified in finding that the exchange contract of May 17, 1926, and the conveyances executed by the plaintiff to the defendants were induced by the false representations of the latter, knowingly made to plaintiff and by him relied upon. Such facts as may be necessary to understand fairly the respective contentions of the parties will be mentioned herein as occasion may arise.

For the defendants it is, however, urged that the written memorandum signed by the plaintiff and the defendant Cook, at the time the exchange agreement was entered into and which is pleaded verbatim in defendants' answer, as we have said, precluded plaintiff from asserting that he had relied upon any representation not contained therein. That memorandum reads as follows:

"Whereas on May 17th 1926, a deal was closed between F. A. Baylies of Uinta County, Wyoming, and Henry J. Vanden Boom of Jackson County, Missouri. Whereby, F. A. Baylies became the owner of the Drakehurst Hotel property located on Lots 9 and 10 Block B. Pratt's Addition, Kansas City Mo., and Henry J. Vanden Boom became the owner of the Baylies Ranch consisting of about 4400 acres in Uinta County, Wyoming, also various personal property.

"In the telegram of acceptance of proposition of the exchange of properties said telegram mentioned certain representations made by Bert L. Cook, Henry J. Vanden Boom, having no way of knowing whether to concur in his agents representations, said representations are herewith set out, and constitute the only representations made.
First.

That the remodeling is now complete, and that the 11 kitchenettes and 4 staterooms have now been added, and that all bills for material and labor have been fully paid.
Second.

That the Heating plant is in good state of repair.
Third.

That the plumbing in the Kitchenettes is new, and the balance of the plumbing is in good state of repair.
Fourth.

That the window shades, Ice Box, In a Door beds, and Gas Ranges belong to the building.
Fifth.

That the building is leased to the Drakehurst Hotel Company for a term of Ten years. But made no representations that this lease would be guaranteed or would be completed, but represented that same was secured by a second mortgage on the furniture.

F. A. Baylies, having inspected while there the other qualities of the building and having satisfied himself from other sources.

Signed F. A. Baylies<br>Signed Bert L. Cook

Signed at Evanston, Wyo. this day and date first above written."

The acceptance telegram of date May 7, 1926, and which is referred to in the memorandum aforesaid, is in this language:

"BERT L COOK AND CO
305 SCARRITT BLDG KANSAS CITY MO
RELYING ON INSPECTION ALREADY MADE
DRAKEHURST HOTEL PROPERTY AND YOUR REP-
RESENTATIONS BAYLES ACCEPTS COOK VANDER-
BOOM OFFER MAY FIFTH WITH FOLLOWING MOD-
IFICATIONS DEAL CLOSE MAY FIFTEENTH NINE-
TEEN TWENTY SIX EVANSTON WYOMING AB-
STRACTS OF TITLE OR TITLE INSURANCE FUR-
NISHED BY EACH PARTY RESPECTIVELY TO THE
OTHER SHOWING GOOD TITLE FREE OF LIENS
EXCEPT ENCUMBRANCES MENTIONED PROPER-
TY TO BE TRANSFERRED BY GOOD AND SUFFI-
CIENT WARRANTY DEEDS INCLUDING GOOD
WATER RIGHTS AND DITCH RIGHTS PERSONAL
PROPERTY SHOWN TRANSFERRED BY BILL OF
SALE FAMILY HOUSEHOLD FURNITURE RE-
SERVED GRANARY FOR STORAGE A REASON-
ABLE TIME
WIRE ANSWER
THE HATTEN REALTY CO."

It appears from the record that in the latter part of April, 1926, the defendant Cook made a trip to Evanston, Wyoming, to look over the ranch property with a view to making the proposed exchange. Subsequently and about the middle of the following month of May, he, with the defendant Tillotson, again came West to examine the property and on the 17th of that month the contract of exchange was signed. Concerning the memorandum quoted above and Cook's first visit, the trial court found:

"At the time of the contract, a memorandum was made and signed by Baylies and Cook concerning representations made, but the Court finds that the representations recited in this memorandum were not intended to, and did not, cover or affect representations made in the printed folder, Exhibit 8, or representations made during Cook's second visit, but covered only the representations made by Bert L. Cook at the time of the first meeting in April, 1926."

This finding is criticized by the defendants as not upheld by the evidence in the case, and in support of this criticism it is pointed out that Baylies testified that he did not "recall any conversation in regard to the Drakehurst Hotel" between him and Cook on the latter's first visit to Evanston, and also that "Mr. Cook did not talk very much about the hotel property in that first trip. I don't just recall what he may have said about it on the first trip." The conclusion is then advanced that this testimony signified that no representations at all as to the hotel property were made by Cook at that time, and hence the court below was in error in making the finding it did. The record, however, does not bear out the defendants' conclusion on this matter. Although it appears that Mr. Baylies' memory as to the representations made by the defendant Cook on the latter's first visit to Evanston was rather faulty, Cook's memory on the subject was not. It will be observed that the plaintiff did not say in his testimony that no representations were made to him then, but merely that he did not "recall" what was said. Cook, in response to his counsel's queries, testified:

"Q. Now, what representations about the hotel property did you make on that occasion, if any?
A. Mr. McVey. In the presence of Baylies.
Q. Yes, to Baylies or Mr. Hatten, either one.
A. Oh, I told them, as near as I could, supported with this appraisement, what I thought about the value of the building, and told them about the neighborhood, and the construction.
Q. Was there anything said about the remodelling of the hotel?
A. Oh, yes. Mr. Baylies had been there, and he knew the remodelling wasn't complete."

So it is quite evident representations were made to Baylies on that occasion concerning the hotel property.

There is another reason also for adopting the view that this finding of the trial court is unassailable here. Upon

cross-examination by the defendants' counsel, Baylies stated:

"A. This memorandum only covered Mr. Cook's first trip here the latter part of April. It had nothing to do with any representations he had made at any other time, before or after.

Q. Why is the recital there—'representations are herewith set out, and constitute the only representations made?'

A. It also contains this further paragraph—'having inspected while there the other qualities of the building and having satisfied himself from other sources.'

Q. Well, that is true, isn't it?

A. That is from that circular. That is the 'other sources,' and he understood it."

This testimony was thereafter in the trial flatly contradicted by Cook. The trial judge having the witnesses before him was entitled to believe or disbelieve one or the other, as he saw the ends of justice could best be subserved, and his finding on their conflicting statements cannot be inquired into here. The principle governing the point is too well known to require citation of authorities.

Again adverting to the memorandum under discussion, its second paragraph recites:

"In the telegram of acceptance of proposition of the exchange of properties said telegram mentioned certain representations made by Bert L. Cook. Henry J. Vanden Boom, having no way of knowing whether to concur in his agents representations, said representations are herewith set out, and constitute the only representations made."

The record makes it very clear, from the defendant Vanden Boom's own testimony, that he was thoroughly familiar with the contents of the printed circular in evidence which was prepared and sent out by Cook, with the former's knowledge and consent, and which, in large measure, contained the representations relied on by plaintiff in entering into the exchange contract—these representations sub-

sequently being discovered by Baylies to be untrue. This circular, which very elaborately described the Drakehurst Hotel and its business, had been received by Baylies several months prior to the execution of the exchange agreement. The quoted paragraph from the memorandum itself establishes, we think, that its purpose was simply to put in writing and so inform the defendant Vanden Boom, as to just what representations his associate Cook had made and with which he (Vanden Boom) was unacquainted. It did not deal with those representations, certainly, with which Vanden Boom was already familiar and it does not purport to do so. Upon the facts presented on this branch of the case, therefore, as we interpret them, we do not consider the plaintiff to be precluded from relying upon the false representations made to him by the defendants through the medium of the printed circular.

But if by any chance we should be mistaken in this view of the facts as we find them in the record, still, under that record generally, our conclusion as to the law applicable to a clause like that one appearing in the quoted paragraph of the memorandum where it is declared, concerning the representations set out therein, that these "constitute the only representations made," leads to a similar result.

For the defendants, authorities are cited upholding the binding effect upon the parties of a stipulation of this character, even where antecedent fraud appears. The courts of Massachusetts, Georgia and New Jersey appear to have adopted the rule that where one declares in his contract that every representation which shall be binding upon the opposite party is embodied in the agreement, no fraud which does not enter into the execution of the contract can be invoked either as a defense or as a ground for an independent action. See Colonial Corporation v. Bragdon, 219 Mass. 170, 106 N. E. 633; O'Meara v. Smythe, 243 Mass. 188, 137 N. E. 294; J. I. Case etc. Co. v. Broach, 137 Ga. 602, 73 S. E. 1063; Boss v. Boston etc. Co., 251 Mass. 455, 146 N. E. 686; Morgan v. Denton, 28 Ga. App. 88, 110

S. E. 328; Equitable Manufacturing Co. v. Biggers, 121 Ga. 381, 49 S. E. 271; Edison Fixture Co. v. Copoulos, 3 N. J. Misc. Rep. 174, 127 Atl. 551. But in Massachusetts it is, nevertheless, held that fraud as to the subject matter of the contract cannot be excluded from the reach of the law by any phrase inserted in the contract itself, and the plaintiff was allowed a recovery, where as a buyer, he was shown a truck with new machinery as the subject of the contract, and shortly thereafter, when the contract was signed, old machinery ·was fraudulently substituted, and the agreement described, by number and model, the substituted parts. The court referred to the cases mentioned above, saying (Butler v. Prussian, 252 Mass. 265, 147 N. E. 892) :

"While we do not depart from those decisions, we do not incline to extend them."

See also Barrie v. Miller, 104 Ga. 312, 30 S. E. 840, 69 Am. St. Rep. 171.

The idea actuating these courts in adhering to the rule thus adopted is well set forth in the opinion in the case of Arnold v. National Aniline & Chemical Co., 20 Fed. (2nd) 364, 56 A. L. R. 4, where by the United States Circuit Court of Appeals for the Second Circuit, it is said:

. "The Massachusetts cases emphasize the desirability of certainty in the contractual relations of those who have made a definite agreement, and if they say that they contract without regard to prior representations and that prior utterances have not been an inducement to their consent, any occasional damage to the individual caused by antecedent fraud is thought to be outweighed by the advantage of certainty and freedom from attacks, which would in the majority of cases be unfounded where such provisions were in the agreement."

The rule, however, which has the support of most of the authorities, both in this country and in England, is stated

in general terms in the annotation in 10 A. L. R. 1472 as follows:

"It is a general rule that provisions in a contract for the sale of real estate or personal property the purpose of which is to secure from the vendee or buyer, in advance, a waiver of, or estoppel against, any claim of fraud by the vendor or seller, his agent or representative, in securing the contract, will not be given effect to preclude the former from setting up or relying upon such fraud in order to defeat the contract or avoid liability thereunder."

Cases from the states of Illinois, Iowa, Minnesota, Missouri, New York, Texas and Wisconsin, are cited as having adopted this view. See also to the same effect: Dieterich v. Rice, 115 Wash. 365, 197 Pac. 1; Omar Oil and Gas Co. v. Mackenzie Oil Co., 14 Del. Chanc. Rep. 36, 138 Atl. 392, 120 A. 852; Webster v. Palm Beach etc. Co., 139 Atl. (Del. Ch.) 457; Bunting v. Creglow, 40 N. D. 98, 168 N. W. 727; Carty v. McMenamin, 108 Or. 489, 216 Pac. 228; Blackwell v. Thomasson, 84 Cal. App. 784, 258 Pac. 724; Jones v. Bankers Trust Co., 239 Fed. 770; Gullett Gin Co. v. Varnado Gin Co., 120 So. (La. App.) 240, 13 C. J. 420, Sec. 350, and cases cited.

In 75 University of Pennsylvania Law Review, 281, referring to the Massachusetts, Georgia and New Jersey decisions, it is said in comment:

"These jurisdictions advance the theory that the vendor, a competent party, has a right to so contract that the excluding clause relates to the whole transaction, and the vendee cannot later explain if he has failed to protect himself by not inserting the representations in the contract. While much may be said for this view, it is felt that the majority rule is the better law. Since fraud has tainted the whole transaction, since misrepresentation has been resorted to to persuade the entry into the contract, the law should not aid in carrying out the fraud by declaring that the insertion of a clause excluding representations should be an absolute bar to the vendee who had been defrauded by a reliance upon prior misrepresentations."

In Webster v. Palm Beach etc. Co., supra, is found this language:

"The last contention made by the defendant is that the complainant is estopped from relying on the alleged fraudulent representations by a clause in the contract which reads:
" 'All the terms and representations made prior to the execution of this contract are contained herein.'
"A sufficient answer to this contention is that whatever may be the rule in other jurisdictions, the Supreme Court of this state has said that a similar but stronger clause than this one, by which a vendor sought to preclude a vendee from setting up fraudulent representations as a defense to a contract of sale, cannot be given a conclusive or controlling effect. Omar Oil & Gas Co. v. Mackenzie Oil Co., (Del. Sup.) 138 A. 392. A perpetrator of fraud cannot close the lips of his innocent victim by getting him blindly to agree in advance not to complain against it."

The Supreme Court of North Dakota, in Bunting v. Creglow, supra, referring to a clause similar in character with that under consideration by the Delaware court, briefly said:

"In so far as the above provision may amount to a release defeating the legal consequences of actual fraud before its presence has become known to the party signing it, it may properly be regarded as of no effect in law."

A very elaborate statement of the reasons underlying the majority rule is to be found in the leading case of Bridger v. Goldsmith, 143 N. Y. 424, 38 N. E. 458.

In Ruddy v. Gunby, 180 S. W. 1043, the Kansas City Court of Appeals discussed the point we are considering thus:

"The contract for the transfer of plaintiffs' farm to defendant contained a provision to the effect that no promise, condition, provision, statement, or representation of any kind should be binding on the parties unless reduced to writing and incorporated in the contract before the sign-

ing thereof. No representations were set out in the contract. Defendant, therefore, says parol evidence is inadmissible to prove the fraud relied on. This is untenable. Fraud vitiates everything, and fraudulent representations made before the signing of a written instrument for the purpose of inducing a party to enter into it are not merged into the contract. Judd v. Walker, 215 Mo. 312, loc. cit. 335, 114 S. W. 979; State v. Lovan, 245 Mo. 516, loc. cit. 539, 151 S. W. 141; Gooch v. Conner, 8 Mo. 391. Parol evidence of fraudulent representations inducing one to enter into a written contract is admissible, notwithstanding the contract contains an express recital that there have been no representations, or that all oral representations shall be inoperative. Wilcox v. Howell, 44 N. Y. 398; New York etc. R. Co. v. Van Horn, 57 N. Y. 473; Bridger v. Goldsmith, 143 N. Y. 424, 38 N. E. 458; Universal Fashion Co. v. Skinner, 64 Hun 293, 19 N. Y. Sup. 62.''

Turning again to the case of Arnold v. National Aniline & Chemical Co., supra, we find in that opinion the following very pertinent remarks concerning the fundamental basis of those decisions which are opposed to the Massachusetts rule:

''The contrary decisions are based upon a greater consideration for the individual who may suffer wrong through deliberate fraud. It is worth remembering that the ingenuity of draftsmen is sure to keep pace with the demands of wrongdoers, and if a deliberate fraud may be shielded by a clause in a contract that the writing contains every representation made by way of inducement, or that utterances shown to be untrue were not an inducement to the agreement, sellers of bogus securities may defraud the public with impunity, through the simple expedient of placing such a clause in the prospectus which they put out, or in the contracts which their dupes are asked to sign. See Industrial etc. Trust v. Tod, 180 N. Y. 215, 73 N. E. 7.''

The reasoning of the authorities last above mentioned appeals to us as to be preferred, and hence in our judgment the plaintiff was not, as a matter of law, precluded from proving the defendants' false representations made

to him prior to and as an inducing cause of his execution of the exchange contract, notwithstanding he had signed the memorandum hereinabove set forth.

It is also contended on behalf of the defendants that plaintiff inspected the hotel owned by them and had a full opportunity of investigation, and that he acted upon such investigation and inspection, and relied thereon except as to the representations specified in the memorandum as being the only ones made.

The proof is, that before negotiations between the parties had commenced, but after he had received the printed circular already mentioned, plaintiff stopped off in Kansas City between trains, and someone who merely officed with the defendant Cook but was not connected with him in any business way, guided plaintiff to the Drakehurst Hotel and he spent from fifteen minutes to a half an hour there. None of the defendants were present. Plaintiff testifies that he looked at the lobby, the parlor, some of the halls and one or two of the unfurnished bedrooms and kitchenettes, and the outside of the building. He did not ask permission to examine the structure. He was a ranchman, in the neighborhood of seventy years of age, unfamiliar with the hotel business, a stranger in Kansas City, and entirely unacquainted with real estate values or desirable locations there. His casual and slight inspection gave him but a superficial view of the property and told him next to nothing concerning the really important matters covered by the representations contained in the printed circular issued by the defendants and which came into his hands.

The course of the decisions dealing with such a situation is sufficiently illustrated by the cases presently to be cited from some of the leading appellate courts of the middle western states of the Union. In general, the facts, the contentions of the parties, and the law applicable will be found in the quotations given below.

In Romine v. Thayer, 74 Ind. App. 536, 128 N. E. 456, we find this language:

"Appellees contend that, appellant having made an investigation of his own, and nothing hindering him from making as full investigation as he chose to make, he cannot now complain of misrepresentations. But appellant did not make an investigation of his own of anything that would in any way disabuse his mind of the misrepresentations that had been made to him, which fact appellees well knew, and therefore had to know that he relied upon their representations as to the matters herein involved. He arrived in Greenfield, in which town he had never been before, about 4 o'clock, and, in company with appellee Crider, had a short talk with a banker who gave him no information whatever regarding the indebtedness of the company. Thereafter, in company with appellee Crider, he visited the store, where he was introduced to the manager, who informed him that appellant was thinking of trading for some stock and wanted to look over the store. The manager talked with him some, and remarked, 'You can see what we are doing.' It does not appear that anything was said about the financial condition of the company, or that books of the company were shown to him, and if they had been, not being expert in such matters, the hasty examination he could have given under such circumstances would have revealed nothing to him. The investigation was made and the deal closed after 4 o'clock. To hold that appellant is presumed to rely on such an investigation as he made rather than on the representations that were made to him would indeed be a violent presumption. He had a clear right to rely upon the representations. Valdenaire v. Henry, 121 N. E. 550; Rohrof v. Schulte, 154 Ind. 183, 55 N. E. 427; Beck v. Goar, 180 Ind. 81, 100 N. E. 1; Culley v. Jones, 164 Ind. 168, 73 N. E. 94; Judy v. Jester, 53 Ind. App. 74, 100 N. E. 15; Tooker v. Alston, 159 Fed. 599, 86 C. C. A. 425, 16 L. R. A. (N. S.) 818."

In Kraus v. National Bank of Commerce, 140 Minn. 108, 167 N. W. 353, the point we are interested in here was disposed of thus:

"Defendant contends that instead of relying upon any representations made by its agents, he examined the property for himself and relied upon his own judgment. It is well settled that where the buyer does not rely upon the representations of the seller but makes a full investigation himself and then acts in reliance upon the information obtained in his own investigation, he is not in position to charge the seller with deceit. Meland v. Youngberg, 124 Minn. 446, 145 N. W. 167, Ann. Cas. 1915B, 775, and cases cited therein. But it is also well settled in this state that where he makes only a partial investigation, and relies in part upon the representations of the seller, and is deceived by such representations to his injury, he may maintain an action for such deceit. Moline-Milburn Co. v. Franklin, 37 Minn. 137, 33 N. W. 323; Marshall v. Gilman, 52 Minn. 88, 53 N. W. 811; Brown v. Andrews, 116 Minn. 150, 133 N. W. 568; Rudolphi v. Wright, 124 Minn. 24, 144 N. W. 430; Meland v. Youngberg, 124 Minn. 446, 145 N. W. 167, Ann. Cas. 1915B, 775; Woodward v. Western Canada Colonization Co., 134 Minn. 8, 158 N. W. 706, L. R. A. 1917C, 270."

Discussing a condition of affairs similar to that presented at bar, the court, in Christensen v. Jauron, 174 N. W. (Iowa) 499, said:

"Counsel for appellant contend, however, that the evidence showed conclusively that plaintiffs inspected the land and ascertained, or by the exercise of ordinary diligence might have ascertained the quality of the land. On this subject the court instructed the jury in substance that if upon inspection of the land plaintiffs ascertained the falsity of the above representations, if made, or might have done so by the exercise of ordinary diligence, they might not recover. The law is not thus tender of persons practicing deceit. If plaintiffs did ascertain the actual condition of the land, of course they could not have relied on the representations as said to have been made. But must the victim of deceit have exercised diligence to ascertain whether the wrongdoer has lied to him as a condition precedent to recovery of the damages suffered in consequence of the deception practiced? See Hise v. Thomas, 181 Iowa 700, 165 N. W. 38; Holmes v. Rivers, 145 Iowa 702, 124 N. W. 801; Hetland v. Bilstad, 140 Iowa 411, 118 N. W. 422, where the court declared that—

" 'The fact that one does not procure the information which ordinary prudence would dictate will not defeat recovery, where, notwithstanding this, he relies on the seller's misrepresentations.' "

To the same effect is Smith v. Werkheiser, 152 Mich. 177, 115 N. W. 964, 15 L. R. A. (N. S.) 1092, 125 Am. St. Rep. 406, where it was said:

"It is insisted, however, that complainants placed no reliance upon this misrepresentation, but did rely upon an examination of the books which contained a correct statement of the circulation. It is true that complainants did undertake to verify the statements made to them by an examination of the books, but we are convinced that that examination was by no means an exhaustive one. In short, we are bound to say that their examination of the books did not lead complainants to discredit the false statements made to them. It is urged that, inasmuch as the books were placed at their disposal, complainants were bound to ascertain the truth, and to place no reliance upon the false statements that had been made to them. This is not the law. A defrauded party does not owe to the party who defrauds him an obligation to use diligence to discover the fraud. Smith v. McDonald, 139 Mich. 225, 102 N. W. 738; Bristol v. Braidwood, 28 Mich. 196."

In Wendell v. Ozark Orchard Co., 200 S. W. (Mo. App.) 747, we find the court remarking in the course of its opinion in the case:

"It is true plaintiff did not buy this land without an opportunity to see it, and it is therefore argued that it must be held he bought on his own judgment. The plaintiff's stay in Goodman and his opportunity to see and investigate was short. While there he was at all times in the company of defendant's agent, who was pointing out only the good qualities. Besides, the plaintiff testifies that he was not looking at this particular land, and his attention was not directed to it, but only to the land in general in that vicinity. When plaintiff returned to Kansas City, he knew nothing of this particular tract, and in fact had given attention to and expected to buy a different tract with no

orchard on it. It would certainly be a harsh rule to hold that an ignorant man, brought up at the carpenter trade in a large city with no knowledge of farming or farm values and much less of orchard values, is precluded from saying that he relied on representations of persons experienced in that business merely because he has had the opportunity to make a single cursory examination of such land.''

After a careful review of both English and American authorities on the subject, the court, in Omar Oil & Gas Co. v. Mackenzie Oil Co., supra, states its conclusions thus:

''Relative to false representations, as a ground of defense, there is one fundamental rule, agreed upon by all the authorities, viz., that a buyer shall not be precluded from relying on such representations unless it clearly appears that he relied on his own investigation, and not on the representation. Mr. Pomeroy, at Section 895, note 4, states it thus:

'' 'The question is, did the party rely on the representation or on his own knowledge? To obviate the effect of the representation, it must be clearly and conclusively shown that he relied on his own knowledge. This, the general doctrine and the qualifications both demand.'

''\* \* \* The better and more reasonable doctrine, the one consistent with the fundamental rule, and supported by the majority of well-considered cases, including those in Texas, is this: The buyer will not be prevented from availing himself of false representations of the seller, unless he makes an investigation on his own account and it is of such character as to fully acquaint him with the essential facts. If the buyer made an investigation that was free and unhampered, and conditions were such that he must have obtained the information he desired, or the facts he seeks to know were as obvious to him as to the seller, and their means of knowledge were equal, he is presumed to have relied on his own investigation, and not on the representation. In such case he could not have been misled by the seller.''

See also Laird v. Keithley, (Mo. Sup.) 201 S. W. 1138; Hoyt v. First National Bank, 247 S. W. (Tex. Civ. App.) 637; Sullivan v. Helbing, 66 Cal. App. 478, 226 Pac. 803, 26 C. J., Sec. 75, p. 1164.

The trial court found in effect that Baylies did not rely upon his own investigation, but chiefly upon the representations contained in the printed circular. This view of the matter we think correct, and we have no hesitation in holding, upon the facts as they appear in the case, that plaintiff was not excluded from such reliance by the very brief and cursory examination he made of the hotel property. This conclusion is in full accord with the authorities as we have seen.

It is further urged for defendants that plaintiff's action is barred by ratification on his part and laches attributable to him. So far as the facts of the case upon which this particular contention must be predicated are concerned, they are quite fully recited in the findings of fact of the trial court, numbered "7" and "8." These findings are in our judgment fairly upheld by substantial evidence in the record, and are as follows:

"7. The Court finds that following the trade plaintiff moved to Kansas City the latter part of May, 1926, rented an apartment in the Drakehurst Hotel, and continued there in seeming security. No rentals were paid by lessee to plaintiff; Crandall made promises which he did not keep, and on July 15th, 1926, the lease with the Drakehurst Hotel Company was cancelled and the Drakehurst interest in the furniture taken over by contract made between plaintiff and F. E. Crandall, as manager of the Drakehurst Hotel Company, upon payment by plaintiff to Crandall of $1,000, assumption by plaintiff of bills owing by the Hotel Company amounting to $1,683.94, and the cancellation of unpaid rental and release of the lessee from its contract, and plaintiff took over the management of the hotel, and became owner of the furniture, subject to the encumbrance of the chattel mortgage.

"8. Sometime in July, plaintiff was furnished by F. E. Crandall with a statement of receipts and disbursements, showing that the gross receipts of the hotel from December 5, 1925, to June 23, 1926, were much less than the rental, averaging less than $1,600 per month, and that at no time did the gross receipts equal the rental for any month. Prior to the cancellation, defendant Cook advised plaintiff

and his wife to cancel the Drakehurst Hotel Company lease, and informed the plaintiff that, in his opinion, Crandall was getting enough money, but was turning it over to a relative in Kansas. In the latter part of July, 1926, Cook stated to plaintiff that the patronage would increase in the fall; that in the spring of the year tenants moved to the suburbs, and in the fall came back, and that the hotel would be full in the fall. Plaintiff relied upon defendant Cook's statements and believed that the business would improve and the hotel be filled in the fall. But business did not pick up, and in September Cook stated in further explanation that people did not move in Kansas City until after election in November. Plaintiff continued in the hotel in reliance upon the statements of Mr. Cook, in the expectation that the hotel would fill up. Early in November plaintiff first discovered that the value of the furniture was not as represented, and that the furniture was not worth the mortgages upon it. Plaintiff thereupon sought legal advice, but was delayed in securing counsel owing to engagements of his counsel, but on the 24th day of December, 1926, the plaintiff tendered back to the defendants a deed executed by plaintiff and his wife to Henry J. Vanden Boom and rescinded the contract of exchange, and demanded back his Wyoming properties. Defendants asked until the following Monday for consideration, and on the 28th day of December refused the tender, whereupon plaintiff removed from the premises.''

Concerning the right of rescission of a contract for alleged fraud, this court, in Griggs v. Meek, 37 Wyo. 282, 261 Pac. 126, 264 Pac. 91, quoted with approval certain language of the opinion in Tarkington, et al. v. Purvis, 128 Ind. 182, 25 N. E. 879, 9 L. R. A. 607. As some of it is, we think, definitely applicable here, repetition may not be inappropriate:

''Equivocal acts, however, which do not clearly evince a purpose, with complete knowledge of the fraud, to retain the property as his own will not defeat the right of a person defrauded to rescind. The act must be unequivocal and must show an election to retain the property after discovering the deceit before the right to rescind is gone. * * *

"Where subsequent acts are relied upon as a defense in a case where fraud is clearly established, it is said the acts must stand upon the clearest evidence and must evince a purpose to waive or forgive the fraud and must amount to a clear election not to rescind. If what is done is merely for the purpose of saving the plaintiff from further loss without any purpose to give up whatever right he may have, either at law or in equity to rescind, the right of rescission will not be affected."

The same phraseology could well be employed also, where a ratification or waiver of fraudulent conduct is claimed. Regarding the matter of laches, in seeking the cancellation of instruments whose execution has been induced by fraud, 9 C. J. 1203, Sec. 84, says:

"Delay in instituting proceedings to set aside a deed superinduced by promises of defendant, or by his fraudulent acts, does not amount to such laches as will bar the suit."

So in Schliska v. Ross, 230 Mich. 225, 203 N. W. 81, it is said:

"While ignorance of one's legal rights will not ordinarily excuse delay in proceedings to obtain rescission, this rule is somewhat relaxed where fraud is charged, and there is evidence that the defrauded party has been lulled into a feeling of security, and his delay in beginning proceedings has been due to the continuing promises of the person who defrauded him. This is particularly true where there is anything in the nature of a confidential relationship between the parties. 21 C. J. 247 et seq."

A similar rule touching actions for damages for asserting fraud is announced in Stockburger v. Brooker, 33 Ga. App. 676, 127 S. E. 663, to this effect:

" 'In order for the vendee to estop himself by waiver or acquiescence from seeking redress for the fraud by an action for damages, he would have to be fully informed of the facts at the time of such waiver or acquiescence.' Estes v. Odom, 91 Ga. 600, 607, 18 S. E. 355."

In Wendell v. Ozark Orchard Co., already cited herein, the point under investigation is considered in the following language:

"It is said that plaintiff delayed bringing this suit for an unreasonable time, and is barred, not by any statute of limitations, but under the doctrine of laches as applied in equitable proceedings. Generally a plaintiff is not required to bring a suit based on fraud until full knowledge of the fraud is brought home to him. This, of course, requires him to be alert and diligent, and does not mean that he can shut his eyes to facts that would disclose the fraud. It is often difficult even when looking backward to say when the defrauded party had that full knowledge which should have prompted him to act. The court should not then be too harsh on the individual who hesitates to engage in litigation. Mere delay, short of the statute of limitations, when nothing else appears, seldom bars an action. The delay must be in some way culpable (Butler v. Lawson, 72 Mo. 227, 249; Dye v. Bowling, 82 Mo. App. 587, 593), or bringing advantage to one party or the other (6 Cyc. 301; Glass v. Templeton, 184 Mo. App. 532, 540, 170 S. W. 665)."

The case of Weigel v. Cook, 237 N. Y. 136, 142 N. E. 444, was one where it appeared that for some eight months and even for several months after the action for rescission on the ground of fraud had been instituted, plaintiffs made actual use of the property involved by bottling and selling water from its springs; they also repaired some of the personal property thus sold to them. Discussing a contention similar to that before us now, the court said:

"From these findings the appellant insists that the plaintiffs had elected to retain the property and affirm the contract; that these acts of ownership were inconsistent with the claim of rescission.

"We take it that the doctrine of election is one of substance and not of mere words. Using the property may or may not be a ratification of the contract according to the circumstances. When it appears that the acts performed are inconsistent with the claim of repudiation, then, and then only, can there be an election to confirm and adopt the contract. A particular act for which an authority may

be cited as indicating an adoption of a contract may under other circumstances have no such force and effect.

"We must consider in this case the nature of the property. The water flowed from springs underneath the ground. Its quantity was uncertain. Defects, as well as fraud, could only be discovered by continued use as well as patient waiting. The plaintiffs from January to June attempted to make good their purchase and the defendants' representations. When they finally discovered that this was impossible, they brought this action for a rescission."

West v. Hoffman, 139 Wash. 13, 245 Pac. 419, deals with like facts and conditions in this fashion:

"Another assignment of error invokes the rule of waiver and ratification. But we do not think it applicable here. True, respondents noticed each season that the fruit did not continue to grow as it should towards the latter part of the season, although as it appears from the evidence they gave the orchard the usual attention and cultivation, but upon complaint to the appellants they assured respondents that they would make it yet, and to stay by the orchard. They persisted until they took independent advice and had the soil examined by qualified persons, when, upon learning the truth, they then stated they could no longer continue the enterprise."

Finally on this point, the language of the United States Court of Appeals for the Sixth Circuit, as it appears in Twin Lakes v. Dohner, 242 Fed. 399, may be recalled to advantage. In that case the court said:

"It is insisted that Dohner, after discovery of the misrepresentation, reaffirmed the contract, or rather, made a new contract. The fact was that, during the first season, the water almost entirely failed. The defendant's agents explained this failure as due to temporary troubles in the irrigation supply, which troubles would at once be remedied and a new contract of purchase was made, which abated some interest and extended the payments over a longer period. Dohner claims that misrepresentations, similar to the original ones, induced him to accept this new contract, and induced him to continue his efforts, and to continue

payments for several years, before he finally became convinced of their falsity and determined to rescind. In his delay after the first year, we see only a hopefulness and a hesitation to embark in litigation, which are not sufficient to bar any relief to which he might otherwise be entitled. The making of the new contract in the first year stands upon different grounds. If he made that contract after he should have known of the falsity of the essential elements on which he now depends, he cannot now disaffirm; but it is not clear that he should be chargeable with this knowledge. He did know, of necessity, that the stated amount of water was not then available for use, but there was no compelling reason why he should not accept defendant's assurances .that the obstacle was only temporary, and that the water was there in the reservoir lakes, and that only unexpected delay in dredging the outlet prevented obtaining the water. Under these circumstances, he cannot be charged with condoning the original misrepresentation.''

Applying the legal principles announced by these authorities to the facts recited above as covering this branch of the case, we are convinced that there was neither an intentional condonation of the fraud perpetrated upon Baylies, nor laches on his part in taking action against it. He did not have complete knowledge of the fraudulent conduct of the defendants until after the middle of November, 1926. His acts in taking over the hotel in July of that year and endeavoring to run it were clearly induced by the continued representations and promises of the defendant Cook. The latter evidently did his best to lull plaintiff's suspicions that he had been overreached, and keep him in possession of the property as long as possible. When disillusionment came with plaintiff's discovery of the true value of the hotel furniture, he acted, we think, with reasonable promptness. That is all the law requires in such case.

What we have heretofore said disposes of the several contentions urged in behalf of the defendant's appeal. Passing to a consideration of the matters involved in plaintiff's cross appeal in case No. 1546, dealing with the accounting feature of the suit below and the amount of the

money judgment awarded him, it is to be observed that no brief was filed by the defendants in opposition to the plaintiff's brief on these matters. While oral argument thereon was submitted by the plaintiff's counsel, there was none for the defendants, doubtless in obedience to our rule 21, which provides, in substance, that upon failure of respondent to file a brief, he "shall not be heard." From the decree before us, it appears that in the accounting the trial court made allowance for the taxes for the year 1926, on the ground of defendants' occupancy of the premises and the fact, as shown by the stipulation of the parties on the subject, that they were an unpaid lien thereon. The plaintiff would certainly ultimately have to pay these taxes, and the allowance was proper. Kerr on Fraud and Mistake (5th Ed.), 214, speaking of rescission, says:

"In cases where the right of rescission is available and has been exercised, the contract is as if void *ab initio*, and the rights of the parties must be determined as if a contract had never existed."

However, the defendants also held the ranch property during the year 1927, at least until after the decree in the case was filed November 17, 1927. No allowance was made by the court for the taxes for that year, though the stipulation aforesaid shows them, too, as an unpaid lien. We discover no distinction in principle between the taxes of the two years, and hence those for the pro rata portion for the year 1927 should have been considered as an item in plaintiff's favor in the accounting. This amount would be $1032.27, as the stipulated taxes for the year 1927 were $1173.16.

The trial court declined to allow plaintiff recovery of interest on the Federal Land Bank loan on the land, totaling $1176.86, during the period defendants held possession of the plaintiff's property. Ordinarily the accounting in a case of this sort would have been upon the basis of the value of the reasonable use of the property. But by a stipulation

of the parties, a different method was employed. That stipulation showed that the amount last mentioned was also an unpaid lien upon the property, and we can see no good reason why, under the method of accounting adopted, the defendants should be relieved from paying interest upon the loan on the land, any more than that they should be excused from paying the taxes while in possession. They certainly enjoyed the use of the land covered by the loan. Plaintiff had no income from his ranch during their occupancy and he will, of course, in order to protect himself, ultimately be compelled to pay this interest. This item, therefore, should have been allowed.

Complaint is made by plaintiff that in the accounting the trial court declined to allow him the value of his time in the care of the hotel after he took over the lease and management thereof from Crandall and the Drakehurst Hotel Company. Baylies testified that his time was reasonably worth $300 per month for 5½ months, totalling $1650. This evidence stands in the record undisputed. The District Court, in its findings of fact preliminary to the decree, declared that:

"There being no evidence offered by defendants denying the correctness of any of the items of account pleaded by plaintiff, the Court finds that plaintiff's statement, as set forth in his amended petition, is correct, and each and all of the items of disbursement set forth in said statement are allowed as proper items due the plaintiff, except the item for $200.00 interest paid on the note due the Hatten Realty Company, which is disallowed."

Plaintiff's amended petition specifically pleaded this item in his statement of account. The stipulation of the parties submitted it to the court. Plaintiff's pleaded account, which the trial court did allow, contained an item of disbursements by plaintiff for wages of hotel employees in the sum of $2474.51. If plaintiff had employed a manager to have general supervision and control over the hotel property—and he could reasonably have done so—undoubtedly his

salary would have been included in the item of the wages, and hence allowed in the accounting. Instead of paying out wages for such a service, plaintiff expended his own time in managing the business. We are unable to perceive why he should not be credited with the unquestioned value thereof. Defendants' property had the benefit of these services, and it is, of course, plain that someone had to exercise functions of this kind. Allowance of this item should have been made.

Finally it is insisted that the court erred in allowing the defendants the sum of $6,000 for work done and materials furnished for the irrigation ditch on the Booth Ranch, so called, which was a part of the Baylies Ranch property covered by the exchange contract. The record shows the following stipulated understanding between counsel in the presence of the court:

"Mr. Guffin: I would like to have an understanding now with Mr. Spaulding and Mr. McVey. We met last night and we agreed—at least, in my mind, and I thought it was perfectly clear and was understood by all of us—that we would stipulate that there was a certain sum of money, amounting to sixty-six hundred and some odd dollars, expended upon the improvement of this ditch on the Booth ranch, and the only question that remained for this Court to decide was whether that improvement was of benefit to that ranch.

"Mr. Spaulding: That it was necessary and a benefit.

"Mr. McVey: And that the cost was reasonable. We didn't enter into any discussion of that."

It is apparent then that the only questions left by the parties for the court to decide was whether the improvement was necessary, a benefit to the property, and its cost was reasonable. When the defendants offered to prove that the land on the Booth Ranch had been benefitted to the extent of $10 per acre, upon plaintiff's own objection, the evidence was rejected. No attempt appears to have been made on plaintiff's part to question seriously the reasonableness of the amounts paid out by the defendants for the

piping, labor and engineering expenses in putting the ditch in condition. On the question of necessity and benefit to the property, as we read the record, the evidence was conflicting, leaving the trial court at liberty to find in favor of the defendants on the point, if it saw fit, as was ultimately done. Its conclusion thus arrived at, we should not disturb.

The claim is made that the principle of trusteeship *ex maleficio* fastened upon defendants by their fraudulent acts in the premises should be strictly enforced against them on this item of the accounting, but we are inclined to the view that the trial court was right in concluding that:

"But the parties having stipulated items of accounting, and introduced evidence to support an accounting, the Court finds that the rules of equity denying the claims of trustees *ex maleficio* have been to that extent waived, and accordingly an accounting should be had. In such accounting, allowance should be made said defendants for $6,000, said sum being, under the evidence, the extent to which the work and material furnished improved the ditch."

This conclusion is reinforced by the oral stipulation between counsel in open court above recited. The proof was that a total of $6690.46 had been expended by the defendants in improving the ditch. The court found that a part of the work done and material furnished, was a useless and unnecessary expense and deducted $690.46 accordingly. It is said there is no comprehensible basis for this deduction, but it would appear that plaintiff has overlooked the testimony of his own witness Robinson, that in order to put a certain part of the work done on the ditch in proper shape, the cost of doing so he would estimate at between $500 and $1,000. We think that the court's allowance of this item of $6,000 in favor of the defendants should remain undisturbed.

It results from what we have said that in so far as the appeal in case No. 1545 is concerned, the judgment and decree of the District Court is affirmed. Touching the cross-

appeal in case No. 1546, the judgment should be modified by adding to the amount of the recovery therein set forth the following items: $1032.27 pro rata taxes for 1927; $1176.86, interest on the Federal Land Bank loan; and $1650, the value of the plaintiff's services in managing the hotel property. And, as thus modified, the judgment will be affirmed.

*Affirmed, with modifications.*

BLUME, C. J., and KIMBALL, J., concur.